# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE

Assigned on Briefs January 10, 2024

## STATE OF TENNESSEE v. RICHARD CALDWELL

**Appeal from the Circuit Court for Rutherford County**
**No. F-85154      Howard W. Wilson, Chancellor**

_____

### No. M2023-00343-CCA-R3-CD

_____

Following a trial, a jury found Defendant, Richard Caldwell, guilty of felony evading arrest, reckless driving, and driving on a revoked or suspended license, for which Defendant received an effective two-year sentence. On appeal, Defendant contends that the trial court erred in denying his request for a jury instruction regarding the State's duty to preserve evidence. After a thorough review of the record and applicable case law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS, JJ., joined.

Jessica F. Butler (on appeal), Assistant Public Defender—Appellate Division; Gerald Melton, District Public Defender; and Billie I. Zimmermann and Katie Ladefoged (at trial), Assistant District Public Defenders, for the appellant, Richard Caldwell.

Jonathan Skrmetti, Attorney General and Reporter; Brooke A. Huppenthal, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Sarah N. Davis and Jerry Blythe, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural Background

In April 2021, the Rutherford County Grand Jury issued an indictment charging Defendant with the following offenses:

| Count | Offense | Classification |
|---|---|---|
| 1 | Evading Arrest | Class D felony |
| 2 | Reckless Driving | Class B misdemeanor |
| 3 | Resisting Arrest | Class B misdemeanor |
| 4 | Driving on a Revoked/Suspended License | Class B misdemeanor |

The case proceeded to trial in May 2022. At the start of proof, the State announced the parties stipulated that, on January l, 2021, Defendant's driver's license "was suspended or revoked, and he was not allowed to drive on the roadways of Tennessee."

Deputy Clarence Christopher Hyder of the Williamson County Sheriff's Office (WCSO) testified that, around 9:00 a.m. on January 1, 2021, he was on routine patrol traveling northbound on Columbia Pike in Williamson County when he observed Defendant, who was driving a silver Chevy Tahoe southbound on Columbia Pike, "swerve into the left turning lane -- halfway in, swerve out, swerve back in, and just stop." Deputy Hyder made a U-turn at the light and then observed Defendant stopped at a red light, waiting to turn onto the ramp to Interstate 840. Deputy Hyder noted, however, that Defendant stopped about 100 yards short of the light and was between the turning lane and the lane beside it.

Deputy Hyder testified that he followed Defendant onto the ramp to I-840 and for "about another mile or so" after they entered the interstate. Deputy Hyder said that, while following Defendant, he observed Defendant failing to maintain his lane of travel several times. At mile marker 34, Deputy Hyder initiated his patrol car's blue lights and sirens and "hit . . . [his] air horn to initiate a traffic stop." Deputy Hyder stated that failure to maintain a lane was a citable offense and grounds for an investigatory stop; additionally, based upon Defendant's driving, he suspected Defendant was driving under the influence.

Deputy Hyder testified that Defendant refused to stop and continued traveling down the interstate. As he followed Defendant, Deputy Hyder observed Defendant's driving "back and forth[,] continuously crossing lines." Deputy Hyder obtained the tag number to Defendant's vehicle and provided it to dispatch. Deputy Hyder continued to pursue Defendant for more than twenty miles, but Defendant never stopped his vehicle.

Deputy Hyder testified that, around mile marker 50, a Rutherford County officer set up a spike strip in the left-hand lane but that Defendant "swerved right into the emergency lane, completely off there; came back in, dodging the spike strip[.]" Then, around mile marker 52, a trooper with the Tennessee Highway Patrol (THP) set a spike strip in the right-hand lane. Deputy Hyder said that Defendant avoided the spike strip by driving "completely off into the grass on the right side" and that Defendant then got back on the

road and kept going. Deputy Hyder testified that he was instructed by his supervisor that, once THP became involved, he should terminate his pursuit. He said that, after Defendant avoided the second spike strip, he terminated his pursuit, with the THP taking over the pursuit "just east of Almaville," outside of Williamson County.

Deputy Hyder explained that the patrol car he was driving was equipped with a dash camera that was activated when he turned on his emergency equipment and was programmed to "go back 30 seconds" and begin recording. He said that his camera recorded his pursuit of Defendant and that he attempted to preserve the video by marking it as a "pursuit" in the WCSO computer system. He said that, when he attempted to obtain a copy of his video for trial, he learned that it had not been preserved. He testified, "In our system, you have to mark it a certain way. It keeps it for so long. I marked it as pursuit. I spoke to the lady that does the video stuff. She has no idea why it wasn't preserved. I have no control over it."

Corporal George Barrett with the Rutherford County Sheriff's Department (RCSD) testified that, anytime a police pursuit crossed over into Rutherford County, the sheriff's department decided whether to intervene "based off of their reason for the stop" and that the department would then "choose whether to continue the pursuit, assist in terminating the pursuit, or assist them while they are proceeding through our county in pursuit." Corporal Barrett explained that, if he saw someone commit additional traffic offenses in Rutherford County, he could stop the driver for that reason, even if a pursuit from another county had been terminated.

Corporal Barrett stated that, on January 1, 2021, there were additional officers on patrol because it was New Year's Day. He stated that, at approximately 9:20 a.m., he was on Florence Road near I-840 "when dispatch came over the radio advising that Williamson County had a vehicle failing to stop, and they were in pursuit." Corporal Barrett proceeded to mile marker 52 on I-840, intending to deploy a spike strip to disable the fleeing vehicle. While waiting, Corporal Barrett heard Deputy Jason Brown announce over the radio that Defendant's vehicle had missed Deputy Brown's spike strip at mile marker 50 and that Defendant was continuing eastbound on I-840. As Defendant drove toward Corporal Barrett's location, Corporal Barrett saw multiple police officers in pursuit behind Defendant.

Corporal Barrett testified that it was raining as he moved into the roadway and deployed his spike strip. He said that Defendant "drove off the right shoulder of the roadway, avoiding the deployment." He estimated that Defendant was driving between twenty to thirty miles an hour when he drove "all the way off the roadway" and then came back up onto the roadway while continuing to be pursued. Corporal Barrett retracted and collected the spike strip and then joined the pursuit. Corporal Barrett testified that another

deputy set up a spike strip at Exit 57. After Defendant avoided that spike strip, THP discontinued their pursuit, and RCSD Sergeant Kyle Frazier instructed all Rutherford County deputies that were in pursuit of Defendant to terminate their pursuit as well.

Corporal Barrett said that, after terminating his pursuit, he continued down I-840 and took Exit 61 onto Jefferson Pike. He turned right and started toward Walter Hill and then observed Defendant in front of him. There was traffic on the roadway. Corporal Barrett followed Defendant on Jefferson Pike and saw him cross "left of center several times" into the oncoming lane of traffic. Defendant also crossed over the fog line one time.

Corporal Barrett testified that, as they approached the intersection of Jefferson Pike and Old Lascassas Road, another deputy was at the intersection ready to deploy a spike strip at a stop sign there. After the deputy deployed the spike strip, however, Defendant turned left, prior to the stop sign, and drove around the spike strip and through a church parking lot. At that point, Corporal Barrett activated his emergency equipment and attempted to stop Defendant's vehicle. Defendant refused to stop for Corporal Barrett; he exited the parking lot onto Lascassas Pike and picked up speed, going between fifty-five and sixty-five miles per hour. Corporal Barrett testified that the posted speed limit on Lascassas Pike was fifty-five miles per hour.

Corporal Barrett testified that, as they proceeded inbound toward Murfreesboro, they went through several intersections, and as they approached Northfield Boulevard, Defendant turned into a parking lot of a Subway and Family Dollar where there were other vehicles. Defendant drove through that parking lot and into the parking lot of an abandoned Food Lion. Corporal Barrett pulled across an exit to the Food Lion parking lot in an attempt to block it; Defendant drove right at him, but "at the last moment, [Defendant] turned right -- went in front of [his] patrol car; and turned right onto Northfield Boulevard." Defendant then ran a red light at Pitts Lane. At that time, Sergeant Frazier terminated the pursuit because traffic "was starting to pick up" and they were "entering the city." Corporal Barrett explained that it was continuing to rain and that the conditions were not safe for a pursuit.

Corporal Barrett testified that he later heard from dispatch that officers from the Murfreesboro Police Department had observed Defendant's vehicle at the intersection of Northfield Boulevard and Memorial Boulevard. Corporal Barrett drove in that direction and saw Defendant turn left into another parking lot by Walter Hill Baptist Church. Sergeant Frazier, who was also in the area, attempted to block the exit of the parking lot. Corporal Barrett testified that he saw Defendant attempting to exit the parking lot through the driveway that Sergeant Frazier was occupying. He explained, "I observed Sergeant Frazier open his driver's side door, and start to give commands to the driver." Defendant then drove forward into Sergeant Frazier's patrol car. At that time, Deputy Aaron Price made contact with Defendant's vehicle in an attempt to disable it. Corporal Barrett

testified, "Sergeant Frazier had started to use his patrol car to push the . . . suspect vehicle backwards at the same time that Deputy Price was trying to push the vehicle sideways . . . and push it back into the parking lot. Again, in an attempt to disable it."

Corporal Barrett said that he parked behind Defendant's vehicle. He then approached the driver's side of the vehicle, giving verbal commands for Defendant to exit the car. He had to reach through the open driver's side window, put the vehicle in park, and turn off the vehicle because Defendant was not complying with the officers' commands. He said that officers pulled Defendant out of the vehicle and that Deputy Price conducted a leg sweep on Defendant to get him to the ground and in handcuffs. Officers then called for an ambulance to check Defendant for any injuries.

Corporal Barrett said that Defendant "was acting confused wondering why we were trying to stop him." Corporal Barrett later determined that Defendant did not have a valid driver's license; he said that a computer check revealed that Defendant's license was suspended. The following exchange then occurred regarding Corporal Barrett's observations of Defendant after officers removed him from the vehicle:

> Q. And did you have reason to suspect [Defendant] might have originally been driving under the influence?
>
> A. His driving, yes, ma'am. I . . . was able to smell, you know, whether there was an odor of intoxicant. There was not. I was able to tell by his general demeanor; the way he was talking. He wasn't slurring his words or anything like that. So I was not looking further into driving under the influence.

Dash camera video of the pursuit from Corporal Barrett's patrol car was introduced as an exhibit to his testimony. He explained that the video first showed his attempt to stop Defendant using the spike strip. He said that, after the pursuit was terminated and he turned off his emergency equipment, his dash camera stopped recording. Corporal Barrett stated that he turned on his emergency equipment again prior to Lascassas Pike, so the video showed that pursuit as well. He said that the dash camera was again turned off when he terminated the pursuit at Pitts Lane and that it was reactivated "just after the intersection of Highway 231 North and Pearcy Street."

On cross-examination, Corporal Barrett testified that his dash camera video did not capture the moment Defendant's vehicle hit Sergeant Frazier's patrol car. He explained that he did not have his camera on at that time because he had not activated his emergency equipment.

Deputy Aaron Price of the RCSD testified that, on the morning of January 1, 2021, he heard the call of a pursuit from Williamson County in which they were requesting assistance. He responded to the area and saw Defendant on Jefferson Pike, as Defendant was driving toward Lascassas Pike. Deputy Price followed behind Corporal Barrett after Corporal Barrett gave instructions to another deputy to set up a spike strip ahead. Deputy Price testified that, when Defendant came to the intersection at Lascassas Pike, the other deputy deployed the spike strip and that he and Corporal Barrett activated their lights and sirens. Defendant drove around the spike strip, around a stop sign and off the road, and then back onto the road. Defendant then fled into a church parking lot before turning back onto Lascassas Pike "going inbound toward the City of Murfreesboro." Deputy Price recalled that it was raining and that he took the lead during this pursuit. He said that there were other vehicles on the road on Lascassas Pike that had to pull over to the side "real fast." He testified that Defendant was driving "slightly above the speed limit" and that Defendant refused to pull over "all the way until we got to the city limits . . . and continued once we pulled into another parking lot in the city." This parking lot contained three open businesses, and there were other vehicles in the parking lot. Deputy Price testified:

> And as we exited that parking lot, we then went into the larger parking lot of Food Lion, where I remember seeing a large box truck and one other vehicle. And as we exited that parking lot, there was a vehicle pulling in that had to pull over due to the fact that they saw us coming[.]

Deputy Price testified that Sergeant Frazier terminated the pursuit when they entered Murfreesboro city limits. Deputy Price turned off his emergency equipment but continued following Defendant at a safe distance. Deputy Price said that, when Defendant pulled into another parking lot, he followed Defendant into the parking lot, and Sergeant Frazier blocked the other parking lot exit. Deputy Price testified that Defendant tried to exit the parking lot but hit Sergeant Frazier's patrol car "head-on." Using the push bar on the front of his patrol car, Deputy Price pushed into the passenger side of Defendant's vehicle to keep Defendant from fleeing any farther. Defendant attempted to back out, but other patrol vehicles were able to pin in Defendant's vehicle. Deputy Price said that he gave Defendant commands to get out of his vehicle and that, when Defendant did not respond to his commands to "get down," he used a leg sweep "to assist [Defendant] down." Deputy Price testified that, after they handcuffed Defendant, Defendant was "pretty hyper" and said multiple times, "I didn't do anything."

THP Sergeant Shawn Boyd testified that, on January 1, 2021, he received a call from dispatch that Williamson County was in pursuit of a vehicle and was requesting assistance from the THP. Sergeant Boyd observed Defendant's vehicle traveling outbound on Highway 231, and he got behind Defendant. Sergeant Boyd said that, when Defendant noticed that Sergeant Boyd and additional county units were following him, Defendant

passed three cars, going over the double yellow line into oncoming traffic to do so. Sergeant Boyd said that Defendant then suddenly turned into a church parking lot off Highway 231 where officers were able to pin in Defendant's vehicle and disable it. Sergeant Boyd said that he saw Defendant's vehicle hit Sergeant Frazier's patrol vehicle, stating that Defendant "went nose-to-nose with Sergeant Frazier." He said that Defendant had to be extracted from his vehicle and taken to the ground to be placed in handcuffs.

On cross-examination, Sergeant Boyd testified that, based upon Defendant's driving, someone could have been injured; he testified that he saw Defendant commit traffic offenses, including improperly passing three vehicles on a double yellow line. Sergeant Boyd agreed that, in addition to Defendant's charges in Rutherford County, Defendant was charged with evading arrest in Williamson County.

Sergeant Kyle Frazier of the RCSD testified that dispatch initially received a "BOLO" or be on the lookout for a silver Chevy Tahoe that was on I-840 in a pursuit with Williamson County. He said that he was supervising Rutherford County's response to the pursuit but that he was not a part of it. Sergeant Frazier stated, "So I was aware, listening, and tracking throughout the whole 40-minute interaction or whatever that interaction was." He said that, after the failed attempts with the spike strips, he "disallowed the pursuit because it was evident that [Defendant] wasn't going to stop." He terminated the pursuit when Defendant exited I-840 onto Jefferson Pike. Sergeant Frazier explained that, after Defendant went around the spike strip, through a parking lot, and back onto Lascassas Pike, he again allowed a pursuit "for a short period of time." When Defendant turned onto Northfield Boulevard, however, he discontinued the pursuit because Defendant was refusing to stop.

Sergeant Frazier said that, after he discontinued the pursuit, he saw the suspect vehicle on Memorial Boulevard. Sergeant Frazier and Sergeant Boyd followed behind Defendant and, at 10:04 a.m., Sergeant Frazier "radio'ed out that [Defendant] . . . was passing vehicles in the head-on lane of travel." Sergeant Frazier testified that, when Defendant turned into a parking lot by a church, he drove around to the other entrance of the parking lot and positioned his patrol car to block it. Sergeant Frazier testified that his patrol vehicle was "going like 0.3 miles per hour when it was struck in the front" by Defendant's vehicle. Deputy Price then struck Defendant's vehicle in the side, and Corporal Barrett got behind the vehicle to pin in Defendant. Sergeant Frazier said that there was only minor damage to the front push bar of his patrol car.

Sergeant Frazier testified that Defendant did not comply with officers' commands and had to be removed from his vehicle. Sergeant Frazier testified that officers were concerned that Defendant was driving under the influence because Defendant was "not

acting what we would call 'normal' in any sense." As such, Sergeant Frazier called for EMS to evaluate Defendant.

Sergeant Frazier said that there was a dash camera video from his patrol car and that he attempted to preserve the video. He testified, "So we mark videos for evidentiary value with a case number and . . . then it gets stored into the cloud on our evidence management database system." He explained, however, that the video was "discarded after six months" even though he had requested that it be saved.

Defendant testified that he was fifty-eight years old at the time of the incident. Defendant testified that he had been diagnosed with Covid and secondary pneumonia and hospitalized from December 17-25, 2020. He said that, after getting out of the hospital, he stayed with his brother in Jackson on New Year's Eve. He stated that, on New Year's Day, he had planned to return some equipment to a lady in Fairview and that he had been driving his brother's silver Chevy Tahoe. Defendant testified that, while on I-840, he missed a turn and "got turned around[,]" so he got off the interstate. He said that he was going to get back on the interstate but got caught at a red light before he could turn onto the ramp. He denied that he stopped in the middle of the road. Defendant said that he saw Deputy Hyder drive past him before he turned onto the ramp to I-840.

During Defendant's testimony, the following exchange occurred:

> Q. Were you going the direction you intended to go?
>
> A. At the time, I thought I was, but I was not.
>
> Q. Do you believe your illness had affected you?
>
> A. Yes.
>
> Q. In what way?
>
> A. I was out of character.

Defendant continued:

> [W]hen I got ready to get on the freeway, I pulled over and got myself on because I seen the officer look. I felt like he was going to turn around. I got my cell phone. It was on airplane mode. I entered onto the expressway. And there was a little white Nissan trailing behind me.

- 8 -

Defendant said that, eventually, Deputy Hyder turned "his signal light on to get behind me." Defendant stated that they drove another fifteen minutes or more before the "little white Nissan" exited the interstate. At that point, Deputy Hyder turned on his blue lights and sirens. Defendant testified that Deputy Hyder's attempted stop was "just out of the blue[.]" He said, "My first thought I said, Lord, . . . what do I do? And the first thing that came in my mind is: Don't pull over until I see a witness."

Defendant admitted that he drove around the first spike strip but said that he slowed down before doing so. He testified that he finally decided to stop once he realized he was in Murfreesboro and saw officers from the Murfreesboro Police Department; he said, "[T]hat's when I pulled into that church lot and gave up. I realized that I had other officers, instead of [the] Williamson County officer that was behind me. And I felt a little more secure."

Defendant denied hitting Sergeant Frazier's patrol vehicle, stating that the video did not show "when we connected[.]" Defendant said that he was wearing his seat belt and that the officer who pulled him out of the vehicle had to disconnect it. Defendant recalled that he told the officers that his "oxygen level had dropped" and that he asked the officers to "give [him] a minute" to get his oxygen level back up before exiting his vehicle. When asked how it would make him feel when his oxygen level got low, Defendant responded, "You're -- you can't hardly breathe. You're tense. Just weird." Defendant admitted that he ran one red light during the pursuit.

Defendant said that he did not stop for Deputy Hyder because he was afraid. Defendant testified:

> The way he stayed behind me so long; and once I seen the last vehicle pull off the expressway, I looked around, and I [saw] nobody else on the expressway, but me and him. I felt like he had plenty of time to run . . . tags, and anything else to put his lights on. And he didn't to it until that last car . . . exited off.

On cross-examination, Defendant testified that his brother had not wanted him to leave that day because he thought Defendant was "acting funny." Defendant testified, "He said I was out of character. I was not myself." When asked if he was driving "a little strangely" because he did not know where he was, Defendant said that it was possible. Defendant agreed that he should not have been driving and that he was confused.

Defendant denied that Deputy Hyder activated his lights and sirens shortly after they got onto I-840. He said that the deputy followed him for almost fifteen minutes. When asked why he did not stop at mile marker 50 when he encountered the first spike strip,

Defendant replied, "I slowed down. I hollered out my window, I don't know why they charge -- why they are trailing me. Nobody pulled up to try to block me in. I put my signal light on and went around it." Defendant also acknowledged driving off the road at the second spike strip at mile marker 52; he said that he saw THP vehicles but did not notice any Rutherford County vehicles at that time. When asked if he was paying attention to the road, Defendant responded, "I was not coherent. I was out of character." Defendant said that he was speeding because he was "forced to speed" and claimed that an officer tried to hit the back of his vehicle while Defendant was on the interstate. Defendant said that he knew what he was doing was dangerous and that, after he avoided the second spike strip, he exited the interstate.

Defendant testified that, when he came to the last spike strip, he came to a complete stop and then went around them; he agreed that he went into the oncoming lane of traffic. He acknowledged that he drove through a parking lot, where there were several businesses, and then onto Lascassas Pike, where officers again turned on their lights and sirens. Defendant agreed that he should have stopped and admitted that he did not do so. He said that he intended to stop in the first parking lot he entered but that "[t]here was not a person out there."

At the close of proof, the trial court held a charge conference, during which the court addressed Defendant's written request for specific jury instructions. As relevant here, Defendant contended that the video of traffic violations he allegedly committed in Williamson County was not preserved by the State and that, as such, the court should instruct the jury with Tennessee Pattern Jury Instruction—Criminal 42.23, Duty to Preserve Evidence.[1] In response, the State argued that, pursuant to *State v. Ferguson*, 2 S.W.3d 912, 915-16 (Tenn. 1999), it did not have a duty to preserve the dash camera video from Williamson County Deputy Hyder's patrol car. The State asserted that Deputy Hyder's dash camera video was not constitutionally material to the Rutherford County case and

---

[1] Tennessee Pattern Jury Instruction—Criminal 42.23 provides as follows:

> The State has a duty to gather, preserve, and produce at trial evidence which may possess exculpatory value. Such evidence must be of such a nature that the defendant would be unable to obtain comparable evidence through reasonably available means. The State has no duty to gather or indefinitely preserve evidence considered by a qualified person to have no exculpatory value, so that an as yet unknown defendant may later examine the evidence.

> If, after considering all of the proof, you find that the State failed to gather or preserve evidence, the contents or qualities of which are at issue and the production of which would more probably than not be of benefit to the defendant, you may infer that the absent evidence would be favorable to the defendant.

argued that dash camera video from Rutherford County showed Defendant committing multiple traffic infractions and evading law enforcement in Rutherford County, thereby negating the relevance of Deputy Hyder's dash camera video from Williamson County.

The trial court found the State did not have a duty to preserve Deputy Hyder's dash camera video. The court found that this lost video would be relevant and may possess exculpatory value "if . . . Defendant was on trial in Williamson County for his conduct there"; however, the court found no apparent exculpatory value in Deputy Hyder's dash camera video as to the instant Rutherford County case. Accordingly, the trial court declined to provide the jury with Defendant's requested instruction regarding the State's duty to preserve evidence.

Following deliberations, the jury found Defendant guilty of evading arrest, reckless driving, and driving on a revoked or suspended license. The jury found Defendant not guilty of resisting arrest. At a subsequent hearing, the trial court sentenced Defendant, as a Range I standard offender, to two years for evading arrest; six months for reckless driving; and six months for driving on a revoked or suspended license. The court suspended Defendant's sentences following the service of sixty days in jail and ordered that all counts run concurrently.

Defendant filed a timely motion for new trial and amended motion for new trial. Following a hearing, the trial court entered a written order denying the motion for new trial. This timely appeal follows.

## II. Analysis

On appeal, Defendant argues that the trial court erred by concluding that the State did not have a duty to preserve Deputy Hyder's dash camera video and by denying his request for a jury instruction regarding the State's duty to preserve evidence. Defendant asserts that the testimony regarding the basis for Deputy Hyder's attempted stop in Williamson County "differed widely" and that the variation between Defendant's testimony and Deputy Hyder's testimony highlighted "the need for the dashcam video as an objective account" of the basis for Deputy Hyder's initiating of his lights and sirens. Defendant contends that the trial court should have viewed the pursuit in Williamson County and the pursuit in Rutherford County as "one continuous event." He maintains that Deputy Hyder's dash camera video was "critically important" to the defense, asserting that Deputy Hyder "had no legitimate basis for initiating a stop" and that the dash camera video "would have put to rest any questions about which narrative was to be believed." Defendant further argues that the trial court did not properly weigh the *Ferguson* factors and that "a proper weighing" demonstrates the need for the requested jury instruction.

The State responds that the trial court properly concluded that it had no duty to preserve Deputy Hyder's dash camera video and that the court acted within its discretion by declining to provide the jury with Defendant's requested instruction.

The question of "[w]hether a trial, conducted without the destroyed evidence, would be fundamentally fair" concerns a constitutional issue, which appellate courts review de novo with no presumption of correctness. *Ferguson*, 2 S.W.3d at 914; *State v. Crass*, 660 S.W.3d 506, 514 (Tenn. Crim. App. 2022). Where fundamental unfairness results, appellate courts will review the trial court's remedial action for an abuse of discretion. *State v. Merriman*, 410 S.W.3d 779, 791-92 (Tenn. 2013). An abuse of discretion occurs when the trial court applies "an incorrect legal standard, reaching an illogical conclusion, or basing a decision on an erroneous assessment of the evidence." *State v. Rimmer*, 623 S.W.3d 235, 260 (Tenn. 2021). Appellate courts will not overrule a trial court's decision "when the chosen remedy is consistent with the findings made by the trial court utilizing the *Ferguson* considerations." *Merriman*, 410 S.W.3d at 791-92; *see Ferguson*, 2 S.W.3d at 917.

The Due Process Clause, pursuant to the Federal and Tennessee Constitutions, guarantees criminal defendants the right to a fair trial. U.S. CONST. amend. XIV, § 1; TENN. CONST. art. I, § 8; *see id.* § 9. To facilitate this right, the prosecution must provide exculpatory evidence that raises a reasonable doubt as to the defendant's guilt, *United States v. Agurs*, 427 U.S. 97, 98 (1976), or, upon request, provide evidence "material either to guilt or to punishment," *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

In *Ferguson*, our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *Merriman*, 410 S.W.3d at 784 (citing *Ferguson*, 2 S.W.3d at 915-16). The court determined that the due process required under the Tennessee Constitution was broader than that required under the United States Constitution and rejected the "bad faith" analysis adopted by the United States Supreme Court. *Id*. at 784-85 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). Instead, the court in *Ferguson* adopted a balancing approach in which a trial court must determine "[w]hether a trial, conducted without the [lost or] destroyed evidence, would be fundamentally fair." *Id*. at 785 (quoting *Ferguson*, 2 S.W.3d at 914).

When a defendant raises a *Ferguson* claim, a trial court must first "determine whether the State had a duty to preserve the evidence." *Merriman*, 410 S.W.3d at 785. "[T]he State's duty to preserve evidence is limited to constitutionally material evidence described as 'evidence that might be expected to play a significant role in the suspect's defense.'" *Id*. (quoting *Ferguson*, 2 S.W.3d at 917). To meet this constitutional materiality standard, "the evidence must potentially possess exculpatory value and be of such a nature

- 12 -

that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id*. (footnote omitted).

If the proof demonstrates the existence of a duty to preserve evidence and further shows that the State has failed in that duty, a court must proceed with a balancing analysis involving consideration of the following factors:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

*Ferguson*, 2 S.W.3d at 917 (footnote omitted). The trial court is required to balance these factors to determine whether conducting a trial without the missing evidence would be fundamentally fair. *Merriman*, 410 S.W.3d at 785. "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Id*. at 785-86.

In this case, the trial court found that the State did not have a duty to preserve Deputy Hyder's dash camera video for the purposes of Defendant's trial for offenses committed in Rutherford County. The trial court found that, although Defendant could not obtain comparable evidence, Deputy Hyder's dash camera video lacked exculpatory value and, therefore, was not constitutionally material. We agree with the trial court's determination.

Defendant was on trial in Rutherford County for actions that took place in Rutherford County, and dash camera video of the Rutherford County offenses from Corporal Barrett's patrol car was played to the jury, which found Defendant guilty of felony evading arrest, reckless driving, and driving on a revoked or suspended license. Deputy Hyder testified that he attempted to stop Defendant at mile marker 34 in Williamson County and that he terminated his pursuit of Defendant soon after crossing into Rutherford County. Under these facts, we cannot conclude that Deputy Hyder's dash camera video was "evidence that might be expected to play a significant role in [the] defense" during Defendant's trial for offenses committed in Rutherford County. *Ferguson*, 2 S.W.3d at

- 13 -

917.  Thus, the State had no duty to preserve Deputy Hyder's dash camera video for Defendant's trial in the instant case.[2]  *See Merriman*, 410 S.W.3d at 785.

Furthermore, even if the State had a duty to preserve Deputy Hyder's dash camera video, the trial court did not abuse its discretion by denying Defendant's requested jury instruction.  In its analysis, the trial court considered the *Ferguson* factors and found that the failure to preserve the dash camera video was the result of simple negligence, and this finding is supported by the record.  Deputy Hyder testified that he marked the recording as a "pursuit" to ensure that the computer system in Williamson County would save and maintain the video.  After discovering that the video was missing, Deputy Hyder spoke to an employee in charge of video record-keeping, who said she had "no idea why it wasn't preserved."  Thus, we agree that the failure to preserve Deputy Hyder's dash camera video was the result of simple negligence.

Regarding the second *Ferguson* factor, the trial court found that Deputy Hyder's dash camera video would have had little significance in the case.  The court noted that Defendant was on trial based on his actions in Rutherford County rather than for his behavior in Williamson County and that the instant case was "not a case like *Merriman* where a video's significance would have been increased because of a lack of other evidence."  The court found that there was "plenty of other evidence . . . introduced at trial, including video evidence from Rutherford County."  Again, the record supports this determination by the trial court.  Deputy Hyder testified that he attempted to stop Defendant because he suspected Defendant was "driving under the influence," and Defendant admitted that he "was not coherent" and possibly "driving strangely" that morning.  Three other officers involved in the pursuit also testified that they suspected Defendant was driving under the influence, as reflected in video evidence introduced at trial.  The video evidence from Rutherford County showed Defendant's attempts to evade police, his swerving off the road, and his overall poor driving.  We thus agree with the trial court's conclusion that the dash camera video from Deputy Hyder's patrol car would have little significance in the instant case.

In considering the third *Ferguson* factor, the trial court found that the other evidence presented at trial was more than sufficient to support Defendant's convictions in this case.  We agree.  As noted by the trial court, the jury heard testimony from five law enforcement

---

[2] Although Defendant asserts that the dash camera video would have shown whether Deputy Hyder had a valid basis to stop him, we note that Deputy Hyder testified the dash camera was only programmed to go back and record thirty seconds prior to his turning on his lights and sirens.  It is unclear from Deputy Hyder's testimony whether Defendant's alleged traffic violations or other suspicious driving occurred within the thirty seconds prior to Deputy Hyder's activating his lights and sirens and would have been caught on the recording.  In other words, if Defendant's alleged conduct occurred outside of the thirty-second window, the video may not have served to clarify the circumstances of the attempted stop.

- 14 -

officers who pursued Defendant in Rutherford County, and the jury viewed dash camera video from Rutherford County. Additionally, Defendant admitted under cross-examination that he committed traffic violations in Rutherford County and did not pull over when Rutherford County officers attempted to stop him, and Defendant stipulated that his license was revoked or suspended on January 1, 2021, when he was driving in Rutherford County. The evidence was clearly sufficient to support Defendant's convictions.

Because the degree of negligence involved in the loss or destruction of Deputy Hyder's dash camera video was minimal, the probative value and reliability of other evidence outweighed the significance of Deputy Hyder's dash camera video, and the evidence at trial overwhelmingly supported Defendant's convictions, the trial court did not abuse its discretion by denying Defendant's request to instruct the jury regarding the State's duty to preserve evidence. Defendant is not entitled to relief.

### III. Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 15 -